UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| GEORGE WAGERS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:22-CV-75-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| STEPHEN R. HOTCHKISS and | ) | |
| THE REYNOLDS COMPANY, | ) | |
| | ) | |
| Defendants. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court addresses Defendants' motion for summary judgment, *see* DE 58, as well as *Daubert* motions filed by each side, *see* DE 47 (Defendants' Motion); DE 57 (Wagers's Motion). All three matters are fully briefed and ripe for review. For the following reasons, the Court **DENIES** DE 57 and DE 58, and **GRANTS in part** and **DENIES in part** DE 47.

## I.  BACKGROUND

### a.  Factual Background

This negligence action arises from a motor vehicle collision between Plaintiff George Wagers and Defendant Stephen R. Hotchkiss, driver for The Reynolds Co. A dashcam mounted to the front of Hotchkiss's vehicle captured a view of the accident and is filed in the record as a three-minute video exhibit. *See* DE 48, Ex. B (Dashcam Footage). While the parties hotly contest many of the key details surrounding the accident, the Court, drawing chiefly from DE 48, begins with a recitation of the facts.

On December 11, 2019, at approximately 12:30 p.m., Wagers and Hotchkiss were both traveling southbound along a four-lane stretch of Interstate-75 in Rockcastle County, Kentucky. *See* DE 58-2 (Traffic Collision Report). For ease of reference, the Court will refer to the right-

most lane as "Lane 1" and the left-most lane as "Lane 4."  Wagers was driving his 2019 Chevrolet Silverado pickup truck, while Hotchkiss was piloting a commercial 2018 T-600 Semi Tractor and Trailer, owned and operated by The Reynolds Co.  *See id.* at 3–4.  In the final minute leading up to the collision, Hotchkiss, passing another semi, was traveling in Lane 2, *see* DE 48 at 17:20:30, while Wagers trailed behind him in Lane 3, outside the dashcam's frame or what it captured in the Hotchkiss vehicle's mirrors.  *See* DE 61 at 4.  Initially, Hotchkiss proceeded forward in the relative center of Lane 2, during which time the lane's left and right hash lines can each be seen in Hotchkiss's side-view mirrors.  *See* DE 48 at 17:20:31–17:21:00.  Eventually, with Wagers still out of frame, Hotchkiss approached and began to overtake another semi traveling in Lane 1.  *See id.* at 17:21:03–07.  As he began to pull even with the Lane 1 semi, in one interpretation, Hotchkiss's vehicle moved to the left, and the boundary line separating Lanes 2 and 3 disappeared from view in the left mirror for 2–3 seconds while Hotchkiss finished passing the semi.  *See id.* at 17:21:10–12.  By 17:21:13, the Lane 3 boundary line reappeared in the left-hand mirror, and Hotchkiss continued forward without issue in Lane 2 for another five seconds.  *See id.* at 17:21:13–17.

At this point, Wagers appears on screen for the first time in Hotchkiss's left mirror, where he can be seen quickly approaching within Lane 3 while drifting to his right.  *See id.* at 17:21:17.  Over the next two seconds, Wagers continued on this trajectory until he was roughly parallel with Hotchkiss, at which point his rightward drift took him over the lane line and caused him to collide with the left side of Hotchkiss's vehicle.  *See id.* at 17:21:18–19.  After this initial collision, Hotchkiss attempted to slow down and move to the right, while Wagers continued on his same forward-right path.  This resulted in Wagers scraping along the side of Hotchkiss's vehicle until he eventually hinged perpendicularly around the front of Hotchkiss's hood.  *See id.* at 17:21:20–

2

22. Wagers careened forward to the right, across the front of the semi, and eventually overturned his vehicle off-camera. *See id.* at 17:21:22–23.

After the collision, Hotchkiss quickly called 911, and Kentucky State Police (KSP) arrived to the scene at 1:03 p.m., where they found Wagers "sitting on the shoulder near his vehicle." *See* DE 58-2 at 1 (Traffic Collision Report). When officers asked each party to describe the accident, Hotchkiss reported that "he observed [Wagers] swerve right into the driver side steer axle of [Hotchkiss's vehicle]," while Wagers simply stated that "he was not sure what happened." *See id.* at 2. Wagers initially told officers that there was another person with him in the truck, and that this person was driving at the time of the wreck. *See* DE 58-2 at 2 ("Wagers believed he had a passenger in [his truck.]"); DE 58-3 (Uniform Citation) ("[Wagers] advised me that he wasn't driving [his] vehicle that someone else was[.]"). However, no such person was ever identified, and Wagers does not presently dispute that he was the driver and sole person within the vehicle. *See* DE 50-1 at 81 (Wagers Dep.).

Officers observed that Wagers "had extremely pin point pupils, extremely slurred speech, and was unable to stand or walk without being assisted." DE 58-3. A search of Wagers's overturned truck uncovered 12 unopened cans of beer, within a 30-pack, in the backseat, though Wagers denied consuming any drugs or alcohol that day. *See id.*; DE 58-2. Officers proceeded to subject Wagers to an "Advanced Roadside Impairment Detection" test and found him to be impaired. *See* DE 58-2 at 2. After Wagers refused to "submit to a preliminary breath test on scene," officers further administered three standardized sobriety tests, two of which Wagers could not complete due to his inability "to stand steady on his feet without being assisted." *See* DE 58-3. As a result, officers placed him under arrest and transported him to Rockcastle Regional Hospital (RRH), where he was admitted at 1:50 p.m. *See* DE 58-2 at 2; DE 58-3; DE 58-5 at 1.

Upon arrival at RRH, Wagers informed staff that a "semi truck caused me [to] wreck" and that he "was not knocked out" at the time of the accident, *see* DE 61-12 (Patient Assessment Report), though he continued to express confusion about whether he was driving. *See* DE 58-4 at 2 (Patient Intake Form) (noting that "[patient] can't recall" whether he was driver or passenger). Wagers's intake form noted his pre-existing conditions included cardiac disease, atrial fibrillation (AFib), and hypertension. *See id.* at 2. Wagers indicated pain/injuries stemming from the wreck in his head, neck, chest, and abdomen areas. *See id.* As a result, treating physicians conducted CT scans of Wagers's head, chest, abdomen, and pelvis. *See id.* at 3. Wagers also provided a blood sample for lab testing of his drug and alcohol levels. *See* DE 58-5 at 1 (Toxicology Report).

Initial clinical impressions diagnosed Wagers with a face contusion, concussion, C-2 orthopedic fracture, and an active AFib episode with rapid ventricular response (RVR). *See* DE 58-4 at 5. Review of Wagers's CT scans further found pericardial effusion, bilateral pleural effusions, small amounts of ascites, and cardiomegaly. *See* DE 58-6 at 1 (Imaging Report). The toxicology report found no traceable amounts of alcohol in Wagers's bloodstream, though it did detect 9 ng/mL of Cyclobenzaprine, a muscle relaxant for which Wagers did not have a prescription. *See* DE 58-5 at 2; DE 50-1 at 33:4–6 (Wagers Dep.). That is a prescription drug but not a controlled substance under federal law.

After determining Wagers was in stable condition, RRH transferred him to the University of Kentucky Medical Center (UKMC) that evening. *See* DE 58-4 at 6. There, Wagers's treatment was overseen by Dr. Henrik Berdel. *See generally* DE 59 (Dr. Berdel Dep.). Wagers was eventually transferred once more for intensive inpatient treatment at Baptist Health Corbin, where he was attended to by Dr. Wajdi Kfoury. *See generally* DE 60 (Dr. Kfoury Dep.). His course in rehab lasted for several weeks. *See id.* at 46.

4

### b. Procedural History

As a result of the collision, Wagers sued both Hotchkiss and The Reynolds Co. in Rockcastle Circuit Court, alleging Hotchkiss operated his vehicle in a negligent manner.  *See* DE 1-2 at 3–7 (Complaint).  Defendants subsequently removed the case to this Court based on diversity of citizenship under 28 U.S.C. § 1441.  *See* DE 1 at 3 (Notice of Removal).  Now before the Court is Defendant's motion for summary judgment.  *See* DE 58 (Motion); DE 58-1 (Memorandum in Support).  Wagers responded in opposition, *see* DE 61 (Response), and Defendants replied, *see* DE 64 (Reply).  The Court also addresses two motions *in limine* to exclude expert testimony.  *See* DE 47 (Defense Motion); DE 57 (Plaintiff Motion).  Both *Daubert* motions are fully briefed.  *See* DE 39; DE 53; DE 54; DE 55; DE 57; DE 62; DE 63; DE 66.  All three motions are thus ripe for review.

## II.  MOTIONS *IN LIMINE*

### a. Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony[1] and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[1] "While state law controls the substance of [plaintiff]'s claim, federal rules govern the procedure, 'including evidentiary rulings made pursuant to the Federal Rules of Evidence.'" *Finley v. Mora*, No. 22-1886, 2023 WL 7550447, at *2 (6th Cir. Nov. 14, 2023) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dowell Pharm., Inc.*, 113 S. Ct. 2786 (1993), the Supreme Court "established a general gatekeeping . . . obligation for trial courts," requiring them "to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001); *see also United States v. Mallory*, 902 F.3d 584, 592 (6th Cir. 2018) ("District courts are the 'gatekeep[ers]' of expert testimony." (alteration in original) (quoting *Daubert*, 113 S. Ct. at 2798)).

Under *Daubert*, "a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009) (quoting *Daubert*, 113 S. Ct. at 2799). "The inquiry is 'a flexible one,' and '[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (alterations in original) (quoting *Daubert*, 113 S. Ct. at 2797). However, the Sixth Circuit has enumerated several "red flags" that caution, situationally and when applicable, against accepting an expert, including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177). The proponent of an expert opinion must establish admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

"*Daubert* sets out a 'flexible' and . . . lenient test that favors the admission of any scientifically valid expert testimony." *United States v. Bonds*, 12 F.3d 540, 565 (6th Cir. 1993);

*see also Daubert*, 113 S. Ct. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Motions *in limine* act "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). "As a general rule, a court should exclude evidence on a motion in *limine* only when that evidence is determined to be clearly inadmissible on all potential grounds." *Tucker v. Nelson*, 390 F. Supp. 3d 858, 861 (S.D. Ohio 2019) (internal quotation marks and citation omitted). "Such motions serve important gatekeeping functions by allowing the trial judge to eliminate from consideration evidence that should not be presented to the jury because it would not be admissible for any purpose." *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citation omitted). However, where the evidence is not *clearly* inadmissible, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy[,] and potential prejudice can be resolved in the proper context." *Tucker*, 390 F. Supp. 3d at 861 (citation omitted). Courts generally should avoid excluding "broad categories of evidence." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). In such a case, the "better practice is to deal with questions of admissibility as they arise." *Id.*

As to the recent revisions to Rule 702, the Court sees little impact, beyond clarification, for a court properly applying the rule as previously phrased. The Court has long recognized the preponderance standard (from Rule 104(a)) on admissibility of opinion evidence and has not viewed reliability findings as a Rule 104(b) matter. The amendments are confirmatory.

### b. Analysis

### i. Joseph Stidham

Defendants seek to exclude the testimony of accident reconstructionist Joseph Stidham.[2] *See* DE 47 (Motion); DE 47-1 (Memo in Support).  Stidham served as a KSP Trooper for eight years, during which time he performed accident investigations and received training in accident reconstruction. Since 1998, he has operated his own accident reconstruction and investigation agency, Stidham Reconstruction & Investigation (SRI).  *See* DE 53-1 (Stidham CV).  On January 18, 2024, Stidham produced an expert report in which he concluded that Hotchkiss caused the accident by improperly crossing into Wagers's lane of travel, and that available evidence largely corroborated Wagers's version of the crash.  *See* DE 47-7 (Stidham Report).

Stidham's latter opinion stems from the parties' dispute over several key facts surrounding the accident.  For his part, Wagers contends that right as he "was about to pass . . . the rear of the Hotchkiss trailer," he suddenly "observed the Hotchkiss vehicle travel across the dividing line and into his lane of travel."  DE 61 at 2.  Upon this encroachment, Wagers claims he took "evasive action in an attempt to avoid colliding with the rear of the trailer but was unable to do so."  *Id.* Wagers alleges that this resulted in "light contact" between his right-front fender and Hotchkiss's left-rear trailer.  *See* DE 50-1 at 60–61, 70–71.  After this initial contact, Wagers testifies that he

---

[2] Defendants also move to strike Wagers's response, which was filed two weeks late.  *See* DE 54 (Motion to Strike).  Wagers in turn filed a motion to extend, retroactively, his response deadline.  *See* DE 55 (Motion to Extend).  Local Rule 7.1 states that "[f]ailure to timely respond to a motion *may* be grounds for granting the motion."  LR 7.1(c) (emphasis added).  While the Court admonishes Wagers for his unexcused tardiness—even in DE 55, he does not provide any reason for the two-week delay—Defendants simultaneously make no argument that they were prejudiced by the untimely filing in any way. Accordingly, and picking the merits over a procedural default, the Court **DENIES** DE 54 and **GRANTS** DE 55, in that the Court will consider Wagers's response on its merits.  The defense has replied to that filing.

"veered [left] over into the faster lane [Lane 4]," *id.* 62, and then overcorrected back to his right, ultimately resulting in the final collision captured on video. *See id.* at 61–62, 65.

Defendants, for their part, argue that there is "nothing to support any movement of the Reynolds' truck out of its proper lane of travel[,] . . . nothing in the video to corroborate [Wagers's] version of coming upon and over-taking the Reynolds' truck or contact with the [rear of the] truck that would have caused him to lose control of his vehicle[, and] nothing to show how the Wagers vehicle got into the position where it is first seen in the dash cam careening across two lanes of travel into the left side of the Reynolds' semi tractor."  DE 64 at 4.

Defendants seek exclusion of Stidham's report on four general grounds: (1) the report lacks any methodology or scientific reasoning and does not reflect a reliable application of established principles and methods to the facts of the case; (2) Stidham has no specialized training in the analysis of dashcam footage and impermissibly relies on his general "experience" as an accident reconstructionist; (3) Stidham's conclusion relies on an improper credibility determination in Wagers's favor; and (4) Stidham failed to account for obvious alternative explanations of the crash.  *See generally* DE 47-1.

When asked to describe his methodology in crafting his report, Stidham stated that he "reviewed all the materials that [were] available, watched the dashcam video itself, analyzed what went on in that video, and analyzed that against what the statements of the drivers were."  DE 49-1 at 75 (Stidham Dep.). Specifically, Stidham's conclusion that Hotchkiss drifted into Lane 3 was based solely on the dashcam footage:

> A.    There is – in my mind, looking at the video, there's no question [Hotchkiss's] vehicle] was on the hyphenated line.
>
> Q.    And that's based upon the video alone?
>
> A.    That is correct, which is the best evidence we have.

9

*Id.* at 110.  In reaching this conclusion, Stidham admitted that he did not know the exact placement of the dashcam relative to the center of the vehicle's hood, and that he did not rely on any scientific measurements of the camera lens or mirror angles because "[t]he camera angle itself is deceptive." *See id.* at 78; *id.* at 108 ("[My conclusion] has nothing to do with the camera angle or the camera position. I'm looking at two different views and then I'm looking out the right side of the truck and looking at how the distance on the right side of the truck increases during that time period. The truck is moving left.").  Stidham confirmed that the video does not show Hotchkiss's tires touching the line, *see id.* at 111, and when pressed to explain how he was able to conclusively determine that Hotchkiss traveled into Lane 3, Stidham wavered:

> Q.   Okay. [Hotchkiss] doesn't merge into the next lane?
>
> A.   You can't say that definitively. He moves toward the – toward the next lane.
>
> Q.   He moves toward, he doesn't merge into it?
>
> A.   We don't know that his truck did not go a foot into that lane. We don't know that. It appears that it crosses the hyphenated – at least goes onto the hyphenated [line].
>
>       . . .
>
> Q.   Okay. To what degree, in your opinion, does Mr. Hotchkiss cross over to the left? How much? How much width? How much of his tires?
>
> A.   There's . . . no way for me to tell you that, ma'am. All I can tell you [is that] the CDL manual . . . tells you when vehicles are in your proximity, you are to maintain space to both sides, in front and rear, and to the sides. You keep your vehicle – you keep your truck centered. He did not do that.

*Id.* at 87, 111; *see also id.* at 132–33 (admitting his uncertainty as to whether Hotchkiss's vehicle went *onto* or *over* the hyphenated line).

When asked to square these ambiguities with his report's conclusion that "it is apparent that Mr. Hotchkiss moved into lane three," *see* DE 47-7 at 7, Stidham cited only to his general experience as an accident reconstructionist:

> Q.   Okay. And where do – how do you establish that he is across the line there?

A.    My experience in doing this and looking at probably 3,000 of these – probably 1,500 of these videos over and over and over.

Q.    Are you basing it on the mirror?

A.    I'm basing it on looking at the mirror and looking out the front of the truck at the front corner, where it's at in the roadway, and then I'm comparing that to . . . a thousand or so [other videos].

*Id.* at 106; *see id.* at 107 ("[J]udging [where the truck is in relation to the line] is something that I'm doing based on my experience and training and driving a truck. . . . In looking at hundreds and thousands of these videos over and over and over and comparing them to the physical evidence, this tells me that truck was across the line."); *id.* at 133 ("It's my opinion, based on . . . all my experience of seeing these dashcams, that [Hotchkiss's vehicle] absolutely went onto the hyphenated line if not over.").

In essence, Stidham formed his encroachment opinion by simply eyeballing the Hotchkiss vehicle's movement to the left—something the jury will plainly be able to judge for themselves. *See* Fed. R. Evid. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). Stidham contends that his professional experience elevates the value of his conclusion here, but this alone is not enough. Certainly, experience may yield qualification, but that is only step one. As to reliability, while Rule 702 "does not require anything approaching absolute certainty," *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670–71 (6th Cir. 2010) (quoting *Daubert*, 113 S. Ct. at 2786), the Court will not blindly accept an expert's conclusions and demands, per the Rule, a preponderantly reliable level of foundationally sound analytical support. *See Finn v. Warren Cnty.*, 768 F.3d 441, 452 n.1 (6th Cir. 2014) ("[A] doctor's mere statement that the opinion is given to a reasonable degree of medical certainty 'does not make a causation opinion admissible. The "*ipse dixit* of the expert" alone is not sufficient to permit the admission of an opinion.'" (quoting *Tamraz*, 620 F.3d at 671)); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("Essentially, [expert]'s opinion . . . is based on nothing more than his

11

training and years of experience as an engineer. Although there may be some circumstances where one's training and experience will provide an adequate foundation[,] . . . this is not such a case. [Expert] conducted no tests and . . . used little, if any, methodology beyond his own intuition."). Thus, when a "witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee note (2000).

Stidham makes repeated references to the thousands of dashcam videos he has watched, and Wagers in his response provides a summary of Stidham's professional experience and qualifications in the field of accident reconstruction. *See* DE 53 at 3–4. The Court does not doubt that Stidham has viewed untold numbers of dashcam videos, nor does it question his listed qualifications as an accident reconstructionist expert. However, nothing in the record or in Stidham's report explains *how* or *why* his general experience and qualifications as an accident reconstructionist support his present conclusion that Hotchkiss tracked into Wagers's lane and caused the accident. The syllogism—I've got years of experience; I've reviewed lots of accident videos; My review of this video yields X opinion; X opinion thus is methodologically sound— suffers the lacuna of no core, explanatory linkage between the experience and the conclusions.

Wagers argues that, in addition to the dashcam footage, Stidham also based his encroachment opinion on a host of other sources, including online research, on-site inspection, review of accident photos, medical records, and "cross checking information from primary and secondary sources for accuracy and authenticity." *Id.* at 4. Even if this were the case, the issue remains the same: no explanation is provided as to *how* Stidham used or relied upon any of these purported sources in reaching his conclusion that Hotchkiss entered Lane 3.

Thus, the Court will exclude Stidham's testimony to the extent that it attempts to opine that Hotchkiss caused the accident by entering Wagers's lane of travel. The Court further excludes Stidham from opining that Hotchkiss caused the accident by violating specific state or federal statutes, as he does in the report. *See Fields v. Ashford*, No. 17-cv-11812, 2019 WL 5704216, at *12 n.12 (E.D. Mich. Nov. 5, 2019) (collecting cases supporting "the proposition that a court should not allow an expert to provide opinion testimony that a party violated a state's motor vehicle code because that testimony states a legal conclusion").

The Court, for the same reasons articulated above, will not allow Stidham to draw on the video to corroborate other aspects of Wagers's testimony. Stidham's report opines that the "movement of the Hotchkiss truck to the left is consistent with the testimony of Mr. Wagers and supports his version of what occurred." DE 47-7 at 7. He also states that the "Wagers vehicle can be seen in the left side spotter mirror moving from the left of [the Hotchkiss truck] into the left front of the Hotchkiss truck," and that this "travel pattern of the Wagers truck is consistent again with his testimony that he swerved left to avoid the initial impact of the Hotchkiss truck then steered back right." *Id.* However, Stidham articulates no cognizable basis or explanation in his report (nor does Wagers provide one in DE 53) as to how the footage alone affirmatively substantiates Wagers's version of the accident over that of Defendants. Critically, he does not link his experience, methodologically, to the proffered views.

Wagers in response argues that Stidham's testimony will be used to help the jury "understand the various aspects of driving a semi tractor trailer," such as "the equipment involved including spotter mirrors on the front fenders as well as the dimensions of the roadway and the vehicles involved." DE 53 at 5. Stidham is certainly qualified to provide basic explanations of commercial trucking terms and equipment. The Court sees no admissibility issues with this

testimonial purpose as currently defined. To this end, Stidham may further offer testimony regarding reasonable operation by a CDL operator, including the duty to keep the vehicle centered and to maintain safe clearances when passing vehicles, as he reported. He may also opine that the video, for the reasons he articulates, does indicate movement toward the left as Hotchkiss passed the other semi-truck. However, he may not stray beyond this into the realm of offering theories on accident causation, into opining that the semi actually encroached, or testimonial corroboration.

Defendants' final argument claims that Stidham failed to adequately account for alternative causes of the collision. Because the Court is not allowing Stidham to testify that Hotchkiss caused the accident by moving left into Wagers's lane, this is now a moot point.

On the terms discussed, the Court accordingly **GRANTS in part** and **DENIES in part** Defendants' motion to exclude the testimony of Joseph Stidham (DE 47).

### ii.    Dr. Timothy Allen

Defendants seek to admit the expert report of Dr. Timothy Allen, principally to show "that Wagers was suffering from alcohol and opiate withdrawal at the time of the accident which in turn impaired his ability to drive and which can explain the swerving that is seen in the dash cam." DE 62 at 1; *see* DE 39-1 (Dr. Allen Report). Dr. Allen is a licensed psychiatrist and neurologist who is board-certified in general psychiatry, forensic psychiatry, and brain injury medicine. *See* DE 39-1; DE 39-2 (Dr. Allen CV). Dr. Allen currently serves as an Associate Clinical Professor within the University of Kentucky's Department of Psychiatry, and his previous experience includes 19 years at the Kentucky Correctional Psychiatric Center. *See* DE 39-1 at 1.

Wagers filed a two-page motion to exclude Dr. Allen's report, with his substantive argument provided here in full:

> Dr. Allen has no basis with which to form an opinion other than speculation as to Wagers' condition prior to the accident. This was a high impact, rollover accident

14

in which the Plaintiff, George Wagers sustained a substantial head injury, which included a concussion and a neck fracture and other injuries. He had no alcohol or opiate drugs in his system. There is simply no medical or factual basis to support Dr. Allen opinion that alcohol and/or drug withdrawal impaired the Plaintiff's ability to drive on the day of this accident.

DE 57 at 2. Wagers also repeatedly argues in reply that Dr. Allen's opinion is speculative and unreliable because it is simply one of many possible causes of the collision. *See, e.g.*, DE 63 at 2 (claiming it is "[j]ust as speculative and conceivable that a bird flew through the window and knocked [Wagers] unconscious prior to the accident").

"[I]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Parks v. Kia Motors Am., Inc.*, Nos. 23-5654/5663, 2024 WL 4024667, at *7 (6th Cir. Sept. 3, 2024) (citing *Jahn v. Equine Servs.*, 233 F.3d 382, 390 (6th Cir. 2000)). The mere "fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Id.*

Here, Dr. Allen utilized a clear and organized methodology to reach his conclusion that Wagers was at high risk of suffering from alcohol and/or opiate withdrawal. He engaged in a detailed review of the relevant evidence, including the dashcam footage, post-crash reports, Wagers's medical records and history, and the depositions of Dr. Berdel and Dr. Kfoury. *See* DE 39-1 at 1–2. He analyzed all evidence of Wagers's confused and "delirious" post-crash behavior. He noted that Wagers's strange behavior aligned with the symptoms of alcohol withdrawal and opiate withdrawal.[3] He addressed and ruled out possible alternative causes such as Wagers's concussion, his AFib with RVR, and Cyclobenzaprine. He explained how Wagers's extensive history of opiate and alcohol use, when connected with the lack of alcohol or drugs in his system

---

[3] Dr. Allen's background, experiences, and credentials leave him well-equipped to opine on the specific symptoms of these two conditions.

on the day of the crash, served as further evidence of potential withdrawal.  And he considered Dr. Berdel's discussion of the effects of alcohol and opiate withdrawal on one's driving.  At the end of this analysis, Dr. Allen was left with alcohol withdrawal and/or opiate withdrawal as the "only reasonable" explanation for Wagers's post-accident behavior.  This is sufficient for *Daubert* purposes, even if Dr. Allen did not account for the fanciful and fact-free possibility of a bird flying through Wagers's window. *See Parks*, 2024 WL 4024667, at *7.  Furthermore, once Dr. Allen established this as the cause of Wagers's post-crash symptoms, it was perfectly reasonable for him to also conclude that Wagers was likely suffering from substance withdrawal immediately *before* the crash too.  It would be up to the fact finder to accept or reject Dr. Allen's rational analyses.

In short, Dr. Allen articulates a sound basis for arriving at his conclusion, and Wagers's conclusory (and   factually inaccurate[4]) motion offers nothing to justify exclusion.  The Court accordingly **DENIES** DE 57.

### III.    SUMMARY JUDGMENT

#### a.  Standard of Review

The parties offer conflicting summary judgment standards: Defendants advocate for the federal standard put forth in Federal Rule of Civil Procedure 56, *see* DE 58-1 at 11–12; DE 64 at 2–4, while Wagers argues for application of the Kentucky standard, as set forth in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991).  *See* DE 61 at 3, 5.

Because the Court is sitting in diversity, it applies Kentucky substantive law and federal procedural law.  *See Gasperini v. Ctr. for Humans., Inc.*, 116 S. Ct. 2211, 2219 (1996) ("Under

---

[4] In reply, Wagers repeatedly characterizes Dr. Allen as concluding that Wagers was "unconscious" in the moments leading up to the accident.  *See generally* DE 63.  However, the Court sees no instance in the record in which Dr. Allen opined that Wagers lost consciousness—in his final conclusion, he merely states that opiate and alcohol withdrawal "impacted [Wagers's] ability to drive at the time of the accident and can explain the swerving seen in the dashcam video."  DE 39-1 at 4.

the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) ("As we are sitting in diversity, we apply the substantive law of Kentucky, the forum state."). While distinguishing between "substantive" and "procedural" law can often be a challenging endeavor, here, Sixth Circuit precedent is unambiguous: "[w]hen there is a motion for summary judgment in a diversity case, the provisions of [Federal] Rule 56 control its determination." *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 574 (6th Cir. 2008) (quoting *Reid v. Sears*, 790 F.2d 453, 459 (6th Cir. 1986)). Thus, the Court will apply the federal Rule 56 summary judgment standard here.

Under Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Avantax Wealth Mgmt., Inc. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (citing *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011)). Furthermore, the Court may not "weigh evidence [or] determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." *Id.* "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. Fed. Deposit Ins. Corp.*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

### b.  Analysis

To prevail on a negligence claim under Kentucky law, a plaintiff must show "(1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) a causal connection between the defendant's conduct and the plaintiff[']s damages; and (4) damages." *Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (Ky. 2019) (citing *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016)). Duty is a question of law for the court, while breach and injury present questions of fact left to the jury. *Patton*, 529 S.W.3d at 729 (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)). Causation operates as "a mixed question of fact and law." *Id.* Kentucky utilizes a pure comparative negligence scheme that "calls for liability for any particular injury in direct proportion to fault." *Hilen v. Hays*, 673 S.W.2d 713, 718 (Ky. 1984) (emphasizing that even "the claimant who is 95% negligent recovers from the defendant . . . for that small portion of the injury, 5%, which is fairly attributable to the defendant's fault"); *see* Ky. Rev. Stat. (KRS) § 411.182 (codifying pure comparative fault doctrine).

In the present motion, Defendants argue that Wagers cannot establish that "(1) Defendants Reynolds and Hotchkiss breached any duty to Plaintiff; or (2) that Defendants Reynolds and Hotchkiss'[s] conduct was the cause-in-fact of Plaintiff's damages." DE 58-1 at 13. The Court addresses each argument in turn.

### i. Breach of Duty

Kentucky law imposes a general obligation on each member of the public "to exercise ordinary care to prevent foreseeable harm." *James v. Meow Media, Inc.*, 300 F.3d 683, 691 (6th Cir. 2002) (emphasis omitted); *accord Shelton v. Ky. Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 908 (Ky. 2013) (citation omitted). This foreseeability standard requires an actor, in essence, to recognize that his conduct involves a risk of causing injury to another person if a reasonable person would have understood such a risk. *See Pathways*, 113 S.W.3d at 90.

Here, there is little doubt that Hotchkiss, as a commercial truck driver traveling along an interstate highway, owed a duty of reasonable care to other drivers sharing the road with him. *See USAA Cas. Ins. Co. v. Kramer*, 987 S.W.2d 779, 782 (Ky. 1999) ("The law of Kentucky requires drivers to operate their vehicles in 'a careful manner, with regard for the safety and convenience of pedestrians and other vehicles upon the highway.'" (quoting KRS § 189.290)); *Petro v. Jones*, No. 11-cv-151-GFVT, 2013 WL 1856423, at *3 (E.D. Ky. May 1, 2013) ("The Court first turns briefly to whether [defendant] had a duty to exercise reasonable care while driving his vehicle. The answer to this question is obviously yes."); *see also* KRS § 189.340(7)(a) ("Whenever any roadway has been divided into three (3) or more clearly marked lanes for travel in one (1) direction, . . . [a] person shall drive a vehicle as nearly as may be practical entirely within a single lane and shall not move from that lane until the driver ascertains that the movement can be made with safety[.]"). The Court finds that Hotchkiss owed a duty of reasonable care to surrounding drivers.

The primary question is instead whether there exists a genuine dispute of material fact concerning breach.   Given their sharply conflicting accounts of the accident, the parties unsurprisingly contest this question.   While Defendants acknowledge the parties' factual disputes, they nonetheless argue for the adoption of their version of events under *Scott v. Harris*, 127 S. Ct. 1769 (2007).   In that case, plaintiff sued a police officer for injuries resulting from a high-speed chase that was captured by the officer's dashcam.   At the summary judgment stage, plaintiff put forward a version of facts portraying himself as a relatively cautious and reasonable driver during the chase.   *See id.* at 1775.   However, the Court found that the dashcam footage blatantly contradicted plaintiff's telling and accordingly refused to adopt it, despite the typical Rule 56 rubric, reasoning that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Id.* at 1776.

The Court first addresses the parties' disagreement over whether Hotchkiss encroached into Wagers's lane.   Despite their contradictory positions on this issue, each side claims that the dashcam footage corroborates their own version of events. *Compare* DE 61 at 4 (Wagers: "The movement of the Hotchkiss tractor trailer can clearly be seen in the mirrors mounted on the fenders of the Hotchkiss truck. . . . [T]he view of the dash cam video of the rear view mirror shows the Defendant, tractor/trailer, crossed the divider line into Wager's [sic] lane . . . ."), *with* DE 64 at 4 (Defendants: "As shown in [Hotchkiss's] driver's side fish-eye mirror, there is nothing to support any movement of the [Defendants'] truck out of its proper lane of travel.").   Here, the Court finds that a genuine factual dispute exists as to whether Hotchkiss tracked into Wagers's lane.   Prior to the collision, Hotchkiss's hood appears to be relatively centered in Lane 2, and the lane's left hash marks are clearly visible in the left mirror.   *See* DE 48 at 17:20:34–17:21:06.   However, during the

20

three-second period in which the alleged lane intrusion occurred, Hotchkiss's hood clearly appears (as a reasonable view) to shift to the left, and the hash lines disappear from view in the left mirror. *See id.* at 17:21:10–13. This makes it impossible to tell from the video footage alone if Hotchkiss remained fully in his lane during these three seconds, or if some part of his vehicle extended into Lane 3. Thus, the issue of whether Hotchkiss encroached into Lane 3 is in genuine dispute. There certainly is proof of leftward movement.

And of course, Wagers directly testified that Hotchkiss crossed into his lane, caused "light" contact between vehicles, and prompted Wagers to swerve left, overcorrect, and strike the front of the semi. *See* DE 50-1, at 60 ("Yeah. Got over into my lane a little bit and I hit him and veered off to the left and back across the front of him."); *id.* at 61 ("I guess I overcorrected to straighten up from it and wrecked."); *id.* at 71. Defendants roundly vilify Wagers as an unreliable narrator, and they'll have their slings and arrows, but the video simply does not categorically refute Plaintiff's version. At summary judgment, the Court may not reject a sworn tale just because it is a doubtful one. As the Sixth Circuit counseled in *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022):

> Under the Supreme Court's summary-judgment rules, we must "believe[ ]" the nonmoving party's "evidence" at this stage, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and "disregard" the moving party's conflicting evidence "that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). When witnesses tell differing stories, therefore, we cannot credit the story of the witness that we find more believable. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. That is the jury's job.

*Id.* at 404. To the extent a blatantly contradictory video might figure into this rubric, as in *Scott*, the Court finds that principle not dispositive here. Like the POV in *Rear Window* (Paramount Pictures 1954), the video here tells only a part of the story, and even that is subject to interpretation. A jury must sort what happened and why.

Even assuming that Hotchkiss did cross the boundary line, negligence is not automatic, as breach still depends upon whether he failed to exercise a reasonable standard of care. *Cf. USAA Cas. Ins.*, 987 S.W.2d at 782 ("A driver of an automobile that strikes another in the rear is not subject to strict liability, but rather must be proven to have violated the duty of ordinary care before he can be found to be at fault." (citing *Lucas v. Davis*, 409 S.W.2d 297, 299–300 (Ky. 1966))). Suffice to say, if Hotchkiss intruded into a space already occupied by Wagers, it could, to a reasonable jury, constitute a breach of his duty to proceed in a reasonably careful manner with regard for the safety and convenience of other vehicles around him. *See id.* The parties present conflicting evidence on this issue as well: Wagers claims that he was in the immediate act of passing Hotchkiss when encroachment occurred, to the point that the two vehicles made "light contact" in Lane 3. *See* DE 61 at 2; DE 50-1 at 60–61, 70–71. Conversely, Defendants rely on *Scott v. Harris* to argue that "[t]here is nothing in the video to corroborate [Wagers's] version of coming upon and over-taking [Defendants'] truck or contact with the truck that would have caused [Wagers] to lose control of his vehicle" and end up in "the position where it is first seen in the dash cam." DE 64 at 4. These are jury issues on a contested record.

Once more, the Court declines to adopt Defendants' set of facts at this stage. It is true that Wagers does not appear in the video during the time in which Hotchkiss allegedly entered Lane 3. However, while this may create ambiguity as to Wagers's positioning at the time of the alleged lane intrusion, the footage does not "blatantly contradict" Wagers's story, as occurred in *Scott*. In their summary judgment motion, Defendants do not offer any evidence about the size of the "blind spot" in Hotchkiss's mirrors. This makes it entirely possible that, consistent with Plaintiff's testimony, the front of Wagers's vehicle had pulled even with the end of Hotchkiss's trailer at the time of alleged encroachment.

22

The same reasoning also applies to Wagers's claim that his right-front fender made "light contact" with the left rear of Hotchkiss's trailer, as this contact could have occurred in Hotchkiss's blind spot or out of the camera's view. Furthermore, given that the contact was light and given that it allegedly occurred at the very back of the attached trailer, it may not have been significant enough to cause Hotchkiss to change course or even notice the contact.

Finally, the positioning and path of travel taken by Wagers's vehicle when it does finally appear on screen also presents a genuine dispute. Wagers claims that, after initial contact, he veered left into Lane 4 and then overcorrected back to the right (and into Hotchkiss). Nothing in the footage expressly contradicts this story: his initial veer to the left could have occurred off camera before the video may have captured his overcorrection back to the right. Defendants themselves state that the footage shows Wagers veering to the right from Lane 4. *See* DE 58-1 at 2. Thus, a genuine dispute exists.

In summation, whether Hotchkiss breached his duty of care depends on (1) whether he improperly encroached into Lane 3, and (2) Wagers's positioning at the time of this encroachment. Because both of these facts are in dispute, the Court finds that the issue of breach "presents a sufficient disagreement to require submission to a jury." *Anderson*¸ 106 S. Ct. at 2511.

### ii. Causation

Defendants next argue that at the time of the accident, Wagers "was suffering from alcohol and opiate withdrawals which impaired his ability to drive and was the cause-in-fact of this collision." DE 58-1 at 15, 15–21.

Defendants first focus on Wagers's confusion and strange behavior in the immediate aftermath of the crash. They point out that KSP officers found Wagers to be impaired because he was "barely able to stand or move without assistance," exhibited slurred speech, and expressed

complete confusion about the events surrounding the accident, including whether he was even driving. *See* DE 58-1 at 16–17.

In conjunction with these facts, Defendants further rely on the expert testimony of Dr. Berdel and Dr. Allen. Pertinent here, Dr. Berdel "acknowledged the possibility that Plaintiff could have been suffering from alcohol withdrawal syndrome at the time of the collision." DE 58-1 at 17–18. Upon watching the dashcam video, Dr. Berdel also commented that "[s]omething wasn't right with [Wagers] then," and that it was "very conceivable that [Wagers] had something going on with him that led him to losing control of his vehicle." *Id.* at 18. Dr. Allen, as previously discussed, found that Wagers was at a "high risk for withdrawal from both alcohol and opiates' at the time of the collision," and that Wagers's "post-accident treatment records offered no other reasonable explanation for Plaintiff's post-collision presentation." *Id.* at 19. As a result, Dr. Allen concluded that alcohol/opiate withdrawal "affected Plaintiff's ability to drive and explained his swerving as seen in the dash camera video." *Id.* Wagers, for his part, provided the following response to these causation arguments:

> The Defendants appeared to argue that the Plaintiff had no alcohol or drugs in his system that would have impaired his ability to operate a vehicle, and because of that he suddenly had an episode of alcohol or opiod [sic] withdrawal which caused him to loose [sic] control of his vehicle. Defendants merely argue an alternative theory that may have and/or could have caused this accident. The only person that is a witness to what occurred at the rear of the trailer is the Plaintiff, George Wagers. This is obviously a question of fact for the jury to determine not only who to believe but also to determine the percentage of fault of each party.

DE 61 at 5.

Under Kentucky law, proximate causation consists of two factors:

> Cause-in-fact and legal or consequential causation. Cause-in-fact involves the factual chain of events leading to the injury; whereas, consequential causation concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages. In Kentucky, the cause-in-fact

component has been redefined as a "substantial factor" element as expressed in Restatement (Second) of Torts § 431.

*Gonzalez*, 581 S.W.3d at 532 (quoting *Lewis v. B & R Corp.*, 56 S.W.3d 432, 437 (Ky. Ct. App. 2001)).  A defendant's actions constitute a "substantial factor" in causing plaintiff's harm if they have an "appreciable effect" in bringing about the injury at issue.  *See Simons v. Strong*, 978 F. Supp. 2d 779, 787 (E.D. Ky. 2013) (quoting Restatement (Second) Torts § 433).

In alleging that Wagers's withdrawal-induced impairment "was the cause-in-fact of this collision," DE 58-1 at 15, Defendants cite extensively to the Northern District of Ohio case *Kinzer v. Service Trucking, Co.*, No. 2:17-cv-675, 2020 WL 815665 (N.D. Ohio Feb. 19, 2020):

> In *Kinzer*, Defendant Mayborodo "pulled his tractor-trailer over into the right-turn only lane at [an intersection] . . . and turned on his four-way flashers." Just over thirty seconds later, Plaintiff Kinzer drifted across multiple lanes and struck the rear of Mayboroda's tractor-trailer, resulting in a severe traumatic brain injury. Kinzer filed suit alleging negligence . . . . According to a witness, Kinzer "slump[ed] over" prior to drifting across the traffic lanes, the responding officer attributed fault to Kinzer, and medical records showed that he was suffering from pneumonia at the time. Kinzer also tested positive for opiates following the collision.

> In their Motion for Summary Judgment, Defendants argued that Kinzer caused the collision, and that "even if [Kinzer] did suffer a sudden medical emergency[,], it would only serve to excuse his own negligence, and not shift the issue of proximate causation to Mr. Mayboroda." In awarding summary judgment in the defendants' favor, the District Court found:

>> [T]here can be no dispute that Plaintiff violated the assured clear distance rule when he struck Mr. Mayboroda's tractor-trailer, and in doing so broke the causal chain, absolving Mr. Mayboroda of any liability. The sudden medical emergency doctrine has no application in this case. Even if it is a defense to Plaintiff's violation of the assured clear distance rule, the sudden medical emergency doctrine does not operate to shift liability from Plaintiff to Mr. Mayboroda. . . . Mr. Kinzer is suing Mr. Mayboroda, not the other way around.

DE 58-1 at 15–16 (footnotes omitted) (citing and quoting *Kinzer*, 2020 WL 815665, at *1–5).

While Defendants seem to view *Kinzer* as directly analogous to the present matter, in reality it puts forth a distinguishable causation scenario. While Kentucky courts would agree that the *Kinzer* plaintiff failed to establish causation, it is not merely because he was suffering from an impairment at the time of the collision. Instead, the causal chain in that case was destroyed because defendant's negligent conduct—illegally stopping in the far-right lane—had *no role in creating* the plaintiff-initiated conduct that led to the crash. Put differently, defendant's negligence itself played no part in causing plaintiff to swerve across four lanes of traffic because plaintiff admitted that this swerve would have occurred regardless of defendant's negligence. Thus, defendant's negligence could not have been a *substantial factor*, a but-for cause, in creating the accident.

Multiple Kentucky cases confirm this causal principle. One such example is *Estate of Wheeler v. Veal Realtors & Auctioneers, Inc.*, 997 S.W.2d 497 (Ky. Ct. App. 1999). There, a driver lost control of his vehicle and struck a tree that was negligently protruding into the roadway. *See id.* at 498. After the driver's estate brought suit, the court found a lack of cause because the driver's initial loss of control was unrelated to the tree's negligent placement:

> Proximate cause has also been found to be "that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred." *Newton v. Wetherby's Adm'x*, 153 S.W.2d 947, 949 (Ky. 1941). "When the original negligence is remote and only furnishes the occasion of the injury, it is not the proximate cause thereof." *Peak v. Barlow Homes, Inc.*, 765 S.W.2d 577, 579 (Ky. Ct. App. 1988).
>
> . . .
>
> [Here], the accident[] [was] directly attributable to other negligent acts and [was] not proximately caused by [defendant's negligent conduct]. In other words, the failure to remove the tree did not cause Wheeler's accident, as it would have occurred absent Veal's [negligence]. *Gerebenics v. Gaillard*, 338 S.W.2d 216, 219 (Ky. 1960); *Newton*, 153 S.W.2d at 949.

*Id.* at 498–99 (citations reformatted).

Another example is provided by *Higginbotham v. Keeneland Ass'n*, No. 2009-CA-000301-MR, 2010 Ky. App. LEXIS 23 (Ky. Ct. App. Jan. 29, 2010). There, an inexperienced teen driver

blew out a tire on the highway, causing her to erratically swerve and reverse until she eventually collided with defendant's vehicle parked on the side of the road. *See id.* at *4. The Kentucky Court of Appeals concluded that even if defendant was negligent in parking the car on the shoulder of the road, this was not a substantial factor in causing the accident:

> [I]t is not sufficient for the Appellants to establish that [plaintiff] would not have struck [defendant]'s vehicle had it not been located on the shoulder of the road. The Appellants must also establish that the location of [defendant]'s vehicle was a "substantial factor" in bringing about the collision and resulting harm. This they simply cannot do. There is not any evidence to support the notion that the location of [defendant]'s vehicle was a substantial factor in bringing about the collision. It is undisputed that [plaintiff] lost control of her vehicle because she improperly reacted to a flat tire. The location of [defendant]'s vehicle had absolutely nothing to do with that fact. Appellants suggest that the location of [defendant]'s vehicle may have influenced [plaintiff]. However, [plaintiff]'s testimony on this subject belies this argument, as she testified that she does not place any blame on [defendant] and in fact instead stated she improperly reacted to the flat tire, in contravention of her drivers' manual instructions. Thus, as a matter of law, [defendant] was not a substantial factor in causing the collision.
> . . .
> [Defendant]'s vehicle parked on the shoulder of the road did not cause this accident; the accident was caused by [plaintiff]'s negligence and her improper reaction to the flat tire and would have occurred absent [defendant] using the shoulder . . . .

*Id.* at *17–18

The facts here, read in a light most favorable to Wagers, put forth a causal scenario distinct from *Kinzer*, *Wheeler*, and *Higginbotham*. Even assuming that Wagers *was* medically impaired at the time of the collision, he has still sufficiently alleged that Hotchkiss's negligent conduct—impinging upon Wagers in Lane 3—played a substantial role in creating the accident. As long as Hotchkiss's initial negligence is what *caused* Wagers to erratically veer, Wagers's level of impairment would not be conclusive. The fact that an impaired Wagers may have reacted unreasonably to Hotchkiss's negligence is certainly relevant for determining the correct apportionment of fault, but it does not speak definitively to causation. An apportioning jury

27

considers the nature of party conduct and the extent of the causal relation between conduct and damages.  *See* KRS § 411.182(2).

The Court confronts sworn proof that Hotchkiss moved toward and into Wagers's path, causing contact and inducing Wagers to veer and overcorrect.  The video, to be interpreted by a lay jury, offers some corroborative proof.  Wagers was not impaired by a substance at the time (as the testing and criminal dismissal show).  He had been on a lengthy mission to and from Richmond, having driven to and from an appointment, evidently without incident, in the period leading up to the accident.  *See* DE 50 at 53–54.  He suffered a concussion in the crash, followed by a lengthy stay in a rehab hospital, and Dr. Berdel opined that Wagers's post-crash presentation was consistent with a concussion.  *See* DE 59 at 24–26.  The jury may exclusively blame Wagers, based on proof from Hotchkiss, the video, Dr. Allen, and impeachment of Wagers.  However, it will be up to neutral citizens to sift the record and assign responsibility.

## IV.  Conclusion

For the above reasons, the Court:

**(1) DENIES** DE 54 (Motion to Strike) and **GRANTS** DE 55 (Motion to Extend).

**(2) GRANTS in part** and **DENIES in part** DE 47 (Motion to Exclude Joseph Stidham).

**(3) DENIES** DE 57 (Motion to Exclude Dr. Timothy Allen).

**(4) DENIES** DE 58 (Motion for Summary Judgment).

This the 27th day of February, 2025.

Signed By:

*Robert E. Wier*

**United States District Judge**